[Cite as *State v. Taylor*, 2015-Ohio-3316.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                          |   | JUDGES:                      |
|--------------------------|---|------------------------------|
| STATE OF OHIO            | : | Hon. W. Scott Gwin, P.J.     |
|                          | : | Hon. Sheila G. Farmer, J.    |
| Plaintiff-Appellee       | : | Hon. Craig R. Baldwin, J.    |
|                          | : |                              |
| -vs-                     | : |                              |
|                          | : | Case No. 2014CA00170         |
| JOHNATHAN B. TAYLOR      | : |                              |
|                          | : |                              |
| Defendant-Appellant      | : | O P I N I O N                |

CHARACTER OF PROCEEDING:     Criminal appeal from the Stark County
                             Court of Common Pleas, Case No.
                             2014CR0468

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      August 17, 2015

APPEARANCES:

For Plaintiff-Appellee          For Defendant-Appellant

JOHN FERRERO                    ANTHONY KOUKOUTAS
STARK COUNTY PROSECUTOR         116 Cleveland Avenue N.W.
BY: KATHLEEN TATARSKY           808 Courtyard Centre
110 Central Plaza South         Canton, OH  44702
Canton, OH  44702

*Gwin, P.J.*

{¶1}   Appellant Johnathon B. Taylor ["Taylor"] appeals from his conviction and sentence after a jury trial in the Stark County Court of Common Pleas for one count of Gross Sexual Imposition in violation of R.C. 2907.05(A), a felony of the third degree.

*Facts and Procedural History*

{¶2}   CV, age 12, had an older sister. Her sister, Anielka Taylor, lived with Taylor, age 34, since August 2009 and eventually married him and had a child. Prior to their marriage, they lived with CV, her mother, DV, and CV's siblings at their home on 4th Street in Massillon, Ohio. After their child was born, they moved to an apartment on North Street in Massillon, Ohio.

{¶3}   CV and Taylor were very close. CV's father did not visit her on a regular basis. DV was born in Nicaragua and her English was limited. Taylor and CV were friends on Facebook and often exchanged text messages. CV often stayed overnight with Taylor and her sister, Anielka. When her sister was home, CV slept on the couch. When she was not home and working at Taco Bell, CV would sleep in the bed with Taylor.

{¶4}   On June 1, 2013 around 10:00 pm, CV's mother received a text message from her daughter. CV had been staying with Taylor and Anielka for a few days. CV asked her mother to pick her up because Taylor had kicked her out of the house. DV went to the Taylor apartment to pick CV up and found her sitting on the outside stairs. CV was scared and upset. DV asked her what had happened and CV did not want to talk about it. When they got home, CV went into her room and would not speak to her mother.

{¶5}    The next day, June 2, 2013, DV had to work an 8:00 am to 4:00 pm shift. When she arrived home from work, CV was still sad and quiet. DV asked her daughter to explain to her what had happened the day before. CV responded that her mother was not going to like what had happened and started to cry. DV told her daughter that if she would not tell her what had happened, they would have to go to the police. CV said it was really bad what she was going to tell her. DV asked, "They touched you." CV responded yes and that it happened many times. This was the first time her mother had ever heard this claim. In fact, CV had never told anyone about the alleged abuse, which she claimed had been ongoing for years.

{¶6}    DV tried to reach her daughter, Anielka, but she did not answer the phone. DV and her boyfriend took CV in the car to Taylor's home. Taylor came out holding his daughter. DV explained to CV that if what she said was true, Taylor would go to jail and he could not see his daughter anymore. DV asked Taylor why he had touched her daughter, CV.  Taylor turned to CV and said, "Tell the truth, because if you don't tell the truth they're going to take me away. Detained." CV continued to cry and said in a loud voice, "you don't believe what I'm telling you." CV said she had not said anything because of Anielka. DV took CV to the Massillon police station.

{¶7}    At 3:45 pm that day, Taylor sent DV a text message explaining that he was angry with CV because she was going to stay with him Saturday but when she got home from the movie, she wanted to go home. Taylor also explained that he was angry because they [CV and Taylor] were going to do a photo shoot and play video games. As for the allegations CV made of Taylor touching her, he explained,

As for me touching her, I can only guess she is talking about when we play fight or sometimes we sleep close together and perhaps my hand was on her while asleep. CV is my sister and I would never try to hurt her. I guess she was so hurt about me lying about Ethan that she felt betrayed that I lied about her and she was very hurt. CV I am so sorry for lying to your mom about Ethan being allowed over here. I am not mad that you said what you did because I betrayed you. Please forgive me.

{¶8} When CV and her mother arrived at the Massillon Police Department later that day, the police officers on duty interviewed them. Detective Bobby Grizzard was assigned to investigate the allegations of sexual abuse by Taylor. Grizzard listened to the interview of CV by the police officers, viewed the interview given by CV to C. J. Cross Taylor, a forensic interviewer from the Children's Network, talked with CV's mother and interviewed CV's sister, Anielka Taylor.

{¶9} Grizzard interviewed Taylor. Taylor denied any contact with CV for purposes of sexual gratification. He admitted that CV slept with him in his bed when his wife was not home and that they had a very close relationship. He admitted that he told CV to leave on June 1, 2013 when it was dark outside. As to the reason CV was making the allegations, Taylor opined that it was because he would not allow her to see her boyfriend and labeled her a "vengeful little kid."

{¶10} Grizzard obtained a search warrant for Taylor's apartment on 9th Street in Massillon and a warrant to obtain pictures of Taylor's penis depicting a mole in the genital region.

{¶11} Grizzard learned from CV that Taylor often used Vaseline and lotion when he had sexual contact with her. Grizzard found bottles of lotion and Vaseline in Taylor's apartment. Grizzard took the couch cushions from the apartment. A DNA expert from the Bureau of Criminal Investigations tested them. The left cushion was positive for semen. DNA testing revealed a mixture of DNA from Taylor and his wife. There were minor DNA peaks presented but the expert was unable to conclude whether they came from CV or not, "She's not a major contributor to the DNA on the cushions, but I can't make a conclusion as to whether she could be that, those extra peaks that I saw." The soiled sheets from the apartment were not submitted for testing.

{¶12} CV reported to Grizzard that she saw no unique markings on Taylor's penis. Grizzard testified that the photographs revealed none. However, upon cross-examination, Grizzard conceded that a mole was present in the thigh or genital region and was depicted in the photograph. (3T. at 426-428).

{¶13} Taylor was also interviewed by Brittnee Stone, a social worker in Stark County Job and Family Services on June 28, 2013. Taylor told Stone he kicked CV out that night and made her sit on the porch because she did not get a ride home after the movies, and because they were supposed to do a photo shoot that night and play video games and she did not want to. Taylor reported they had a "super close" relationship - like brother and sister - and that one time while sleeping in his bed, he woke up and her hand was on his penis. Another time, he woke up while she was in his bed watching television and he was nude. CV slept on the couch when his wife was home and in bed with him when she was not home. Taylor again denied any sexual contact with CV.

{¶14} CV was also seen by a nurse practitioner who noticed no signs of sexual trauma or other abnormalities. The nurse practitioner also testified that the absence in CV's medical history of any indication of abuse was significant because of the mandatory reporting requirements of the medical profession when dealing with indications of sexual abuse or trauma.

{¶15} The police also interviewed another child that CV claimed to have told about the abuse. This other student denied ever being told about any abuse.

{¶16} C.V. herself testified that her mother set up a reporting policy for potential abuse scenarios.  Her mother specifically and repeatedly told her numerous times throughout the years what she was to do in the event she was put in a position that made her uncomfortable. CV admitted despite being told "a hundred times" she never once said anything to her mother about the abuse.

{¶17} Anielka, who had lived at all times with Taylor, including when they were sharing the home on Fourth Street, testified that it simply was an impossibility for this protracted period of abuse to have taken place underneath the noses of all the other people living in close proximity without anyone noticing. Anielka testified she spent a lot of time with her younger sister, and would have noticed if something was wrong. Taylor was not even living in the home during parts of 2009 that CV claimed he was there and abusing her.  Furthermore, when he was living there, his work schedule was such that would preclude him from being around in the timeframes that CV claimed he was there. Anielka additionally she testified that Taylor was simply never alone with CV to the extent that CV was claiming.

{¶18} Testimony was presented that CV was seeing a young boyfriend at the time of the accusations in June. On the night in question, CV admitted Taylor did not want to take her home because he would have to wake his baby. Just the day before, CV had been on a secret date with her boyfriend again. It was well known throughout the family that CV was not permitted to have this boyfriend or to go out late with her friends. CV testified her mother "wouldn't let her" have a boyfriend. Her mother testified that she was not aware CV was hiding her boyfriend from her, and would have "punished" and "scolded" her for her behavior. Her mother was further unaware of the sexually graphic texts CV was sending and the pictures she was posting on Facebook of her kissing her boyfriend.

{¶19} On April 2, 2014, Taylor was indicted by secret indictment on the charges of Sexual Battery and Gross Sexual Imposition both felonies of the third degree.

{¶20} After hearing the evidence and receiving instructions from the trial court, the jury reported that they were unable to reach a unanimous verdict on either count of the indictment. After the trial court rendered a "*Howard* charge[1]," the jury returned with a unanimous verdict of "not guilty" of the charge of sexual battery and "guilty" of the charge of gross sexual imposition.

{¶21} Taylor was sentenced to the maximum term of 60 months in prison and labeled a Tier II sex offender.

---

[1] In *State v. Howard,* 42 Ohio St.3d 18, 537 N.E.2d 188(1989), the Ohio Supreme Court approved a supplemental charge to be given to juries that have become deadlocked on the question of conviction or acquittal.

*Assignment of Error*

{¶22} "I. APPELLANT'S CONVICTION'S [sic.] WERE [sic.] AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

*Analysis*

{¶23} In his first assignment of error, Taylor challenges the sufficiency of the evidence; he further contends his conviction is against the manifest weight of the evidence produced by the state at trial.

{¶24} Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which requires a court of appeals to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id.; see also *McDaniel v. Brown*, 558 U.S. 120, 130 S.Ct. 665, 673, 175 L.Ed.2d 582(2010) (reaffirming this standard); *State v. Fry*, 125 Ohio St.3d 163, 926 N.E.2d 1239, 2010–Ohio–1017, ¶146; *State v. Clay*, 187 Ohio App.3d 633, 933 N.E.2d 296, 2010–Ohio–2720, ¶68.

{¶25} Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 1997-Ohio–355. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in

their minds, they shall find the greater amount of credible evidence sustains the issue, which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis sic.) Id. at 387, 678 N.E.2d 541, *quoting* Black's Law Dictionary (6th Ed. 1990) at 1594.

{¶26} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the fact finder's resolution of the conflicting testimony. Id. at 387, 678 N.E.2d 541, *quoting Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). However, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721 (1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" Id.

"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.

\* \* \*

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent

with the verdict and judgment, most favorable to sustaining the verdict and

judgment."

*Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn.

3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶27} In the case at bar, Taylor contends that the witnesses were not credible

particularly the testimony of CV, the twelve year old victim. Taylor claims that CV's

account of the time the abuse occurred was contradictory, her claims of where the

abuse occurred "varied wildly" and she never complained about the abuse to her

mother, doctors, teachers or others before June 2013. Taylor also points to the state's

lack of corroborating evidence such as evidence of sexual trauma reported during her

physical examination, lack of CV's DNA on sheets, bed or couch cushions, CV's inability

to describe the mole in Taylor's genital area and Taylor's wife, Anielka, failing to

observe any signs of sexual trauma. Additionally, Taylor points to CV's motive for

accusing him of sexual abuse as being her interest in a boyfriend, which was forbidden

by her mother.

**1. Time and date of the offense.**

{¶28} Taylor argues that the record fails to establish when the offense took

place. However, specificity as to the time and date of an offense is not required in an

indictment. Under R.C. 2941.03, "an indictment or information is sufficient if it can be

understood therefrom: * * * (E) That the offense was committed at some time prior to the

time of filing of the indictment * * *." An indictment is not invalid for failing to state the

time of an alleged offense or doing so imperfectly. The state is not required to prove that

an offense occurred on any specific date, but rather may prove that the offense

occurred on a date reasonably near that charged in the indictment. *State v. Adams,* 5th Dist. Licking No. 02-CA-00043, 2002-Ohio-5953, ¶ 8.

**{¶29}** If such is not fatal to an indictment, it follows that impreciseness and inexactitude of the evidence at trial is not *"per se* impermissible or necessarily fatal to a prosecution." *State v. Robinette*, 5th Dist. Morrow No. CA-652, 1987 WL 7153(Feb 27, 1987). The question in such cases is whether the inexactitude of temporal information truly prejudices the accused's ability fairly to defend himself. *State v. Sellards,* 17 Ohio St.3d 169, 478 N.E.2d 781(1985); *State v. Gingell*, 7 Ohio App.3d 364, 368, 455 N.E.2d 1066, 1071(1st Dist. 1982); *State v. Kinney*, 35 Ohio App.3d 84, 519 N.E.2d 1386(1st Dist. 1987).

**{¶30}** As this court has noted: "[t]ime is neither essential nor an element of the crime of sexual battery." *State v. Robinette, supra.* In *Robinette,* this court stated,

> We note that these particular cases often make it more difficult to ascertain specific dates. The victims are young children who may reasonably be unable to remember exact times and dates of psychologically traumatic sexual abuses. This is especially true where the crimes involve several instances of abuse spread out over an extended period of time. *State v. Humfleet* (Sept. 9, 1985), Clermont App. No. CA84-04-031, unreported, at 15. The problem is compounded where the accused and the victim are related or reside in the same household, situations which often facilitate an extended period of abuse. An allowance for reasonableness and inexactitude must be made for such cases considering the circumstances.

{¶31} In *State v. Sellards*, the Supreme Court gave two examples of when the failure to provide specific dates and times could be prejudicial to the accused. The court first noted that if the age of the victim were an element of the crime with which the accused had been charged and the victim bordered on the age required to make the conduct criminal, then the failure to provide a more specific time frame would be prejudicial. This is true because "specific dates of sexual conduct might well have become critical to the accused's ability to prepare a defense, since sexual conduct toward one thirteen years of age or older would not constitute the offense of rape as defined in the charged section of the criminal code, R.C. 2907.02(A)(3)." *Sellards,* 17 Ohio St.3d at 172, 478 N.E.2d at 785. The second situation is where "the defendant had been imprisoned or was indisputably elsewhere during part but not all of the intervals of time set out in the indictment. Again, under such circumstances, the inability of the state to produce a greater degree of specificity would unquestionably prejudice the defense." Id. The *Sellards* court noted,

> The record in this case does not indicate that the failure to provide the accused with a specific date was a material detriment to the preparation of his defense. In this regard, we note that while appellee claims on appeal that the inexactitude of the indictment and bill of particulars as to date denied him the ability to present an alibi defense, appellee never filed a notice of intent to rely on an alibi as is required by Crim.R. 12.1. (Cf. *State v. Dingus* [1970], 26 Ohio App.2d 131, 137, 269 N.E.2d 923 [55 O.O.2d 280]; *Gingell, supra,* at 368, 455 N.E.2d 1066.)

17 Ohio St.3d 169, 478 N.E.2d 781(1985).

**{¶32}** Sufficient evidence was presented through the testimony of CV and the forensic interview done by C. J. Cross Taylor. CV reported that Taylor touched her genital area and breasts when Taylor started living with the family in 2009 and continued until 2013. She described in detail how Taylor touched her breasts, vagina and pubic area both with her clothes on and with her clothes off. Further, Taylor, who was 34 years old, admitted in his interview with Brittnee Stone, a social worker in Stark County Job and Family Services on June 28, 2013 that he slept in the same beds as a twelve-year-old CV when his wife was not home. He further admitted that one time while sleeping in his bed, he woke up and her hand was on his penis. Another time, he woke up while she was in his bed watching television and he was nude. (3T. at 438-439).

**2. Location of the sexual activity.**

**{¶33}** Taylor argues that no credible evidence or sufficient evidence established where the sexual contact took place.

**{¶34}** Taylor's wife, Anielka, verified that Taylor lived with the family in 2009 and that her sister CV often stayed at their North Avenue apartment for sleepovers. Taylor himself, while denying any intentional sexual contact, admitted that CV slept with him in his bed when his wife was not home.

**3. Inconsistent verdict.**

**{¶35}** Taylor contends that the jury's inconsistent verdicts in finding him not guilty of sexual battery but guilty of gross sexual imposition are evidence that the jury lost its way.

**{¶36}** It is well-established "inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses

to the same count." *State v. Lovejoy*, 79 Ohio St.3d 440, 1997-Ohio-371, 683 N.E.2d 1112, paragraph one of the syllabus; *State v. Brown*, 12 Ohio St.3d 147, 149, 465 N.E.2d 889(1984). "Each count in an indictment charges a distinct offense and is independent of all other counts; a jury's decision as to one count is independent of and unaffected by the jury's finding on another count." *State v. Cope*, 12th Dist. Butler No. CA2009–11–285, 2010–Ohio–6430, ¶69.

**{¶37}** Accordingly, we reject Taylor's argument alleging inconsistent verdicts as it is based on different counts.

### 4. Evidence of crime.

**{¶38}** R.C. 2907.05 provides in pertinent part:

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

* * *

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

**{¶39}** "Sexual Contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person". R.C. 2907.01. Accordingly, touching the "erogenous zone" is what is prohibited.

{¶40} R.C. 2901.22 provides,

(A). A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

{¶41} Evidence was presented through the testimony of CV and the forensic interview done by C. J. Cross Taylor. CV reported that Taylor touched her genital area and breasts when Taylor started living with the family in 2009 and continued until 2013. She described in detail how Taylor touched her breasts, vagina and pubic area both with her clothes on and with her clothes off.

{¶42} Further, Taylor, who was 34 years old, admitted in his interview with Brittnee Stone, a social worker in Stark County Job and Family Services on June 28, 2013 that he slept in the same beds as a twelve-year-old CV when his wife was not home. He further admitted that one time while sleeping in his bed, he woke up and her hand was on his penis. Another time, he woke up while she was in his bed watching television and he was nude. (3T. at 438-439).

{¶43} In *State v. Mundy*, the court observed,

With respect to prosecutions such as this one under R.C. 2907.05(A)(4):

"[T]he proper method is to permit the trier of fact to infer from the evidence presented at trial whether the purpose of the defendant was sexual arousal or gratification by his contact with those areas of the body described in R.C. 2907.01. In making its decision, the trier of fact may

consider the type, nature and circumstances of the contact, along with the personality of the defendant. From these facts the trier of facts may infer what the defendant's motivation was in making the physical contact with the victim. If the trier of fact determines, that the defendant was motivated by desires of sexual arousal or gratification, and that the contact occurred, then the trier of fact may conclude that the object of the defendant's motivation was achieved." *State v. Cobb* (1991), 81 Ohio App.3d 179, 185, 610 N.E.2d 1009, 1013.

Simply put, R.C. 2907.05(A)(4) forbids touching a person under age thirteen or causing a person under age thirteen to touch the offender on certain parts of the body, including the genitals, buttocks, or in the case of a female the breasts, for the specific purpose of sexually arousing or gratifying either person. Whether that touching was undertaken for the purpose of sexual arousal or gratification must be inferred from the type, nature, and circumstances surrounding the contact. In other words, would an ordinary prudent person or a reasonable person sitting as a juror perceive from the defendant's actions, and all of the surrounding facts and circumstances, that the defendant's purpose or specific intention was arousal or gratification of sexual desire.

99 Ohio App.3d 275, 288-289, 650 N.E.2d 502(2nd Dist. 1994). See also, *In re M.D. and B.D.*, 5th Dist. Knox No. 2011-CA-9, 2012-Ohio-31, ¶¶ 54-55.

{¶44} Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that

Taylor committed the crime of gross sexual imposition with a person less than thirteen years of age. We hold, therefore, that the state met its burden of production regarding each element of the crimes of gross sexual imposition, and, accordingly, there was sufficient evidence to support Taylor's conviction.

**5. Credibility and motive.**

{¶45} Taylor faults CV's credibility because she never disclosed the sexual contact before June 2013 and that no one noticed any inappropriate sexual contact before the June 2013 disclosure. Taylor further questions CV's motive for reporting the sexual abuse in June 2013 by claiming that she was trying to get him in trouble for not letting her see her boyfriend.

{¶46} As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence, upon which the fact finder could base his or her judgment. *Cross Truck v. Jeffries*, 5th Dist. Stark No. CA–5758, 1982 WL 2911(Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction*, 54 Ohio St.2d 279, 376 N.E.2d 578(1978). The Ohio Supreme Court has emphasized: "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 334, 972 N.E. 2d 517, 2012-Ohio-2179, *quoting Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio

Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978). Furthermore, it is well established that the trial court is in the best position to determine the credibility of witnesses. *See, e.g., In re Brown*, 9th Dist. No. 21004, 2002–Ohio–3405, ¶9, *citing State v. DeHass*, 10 Ohio St .2d 230, 227 N.E.2d 212(1967).

**{¶47}** Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the fact finder lost its way.'" *State v. Pallai*, 7th Dist. Mahoning No. 07 MA 198, 2008-Ohio-6635, ¶31, *quoting State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964 (2nd Dist. 2004), ¶ 81. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke,* 7th Dist. Mahoning No. 99 CA 149, 2002-Ohio-1152, at ¶ 13, *citing State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999).

**{¶48}** The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212(1967), paragraph one of the syllabus; *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶118. *Accord, Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

**{¶49}** The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such

inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP-739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 WL 284714 (May 28, 1996). Indeed, the jury need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP-1238, 2003-Ohio-2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks, supra.*

{¶50} We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. The jury neither lost his way nor created a miscarriage of justice in convicting Taylor of the charges.

{¶51} Based upon the foregoing and the entire record in this matter, we find Taylor's conviction is not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury as a trier of fact can reach different conclusions concerning the credibility of the testimony of the state's witnesses and Taylor and his witnesses. This court will not disturb the jury's finding so long as competent evidence was present to support it. *State v. Walker*, 55 Ohio St.2d 208, 378 N.E.2d 1049 (1978). The jury heard the witnesses, evaluated the evidence, and was convinced of Taylor's guilt. The jury

further found Taylor not guilty of the crime alleged in the first count of the indictment, sexual battery.

{¶52} Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crime beyond a reasonable doubt.

{¶53} Taylor's sole assignment of error is overruled.

{¶54} For the foregoing reasons, the judgment of the Court of Common Pleas, Stark County, Ohio is affirmed.

By Gwin, P.J.,

Farmer, J., and

Baldwin, J., concur